```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
CANON INC. and CANON U.S.A., INC.,       :       14cv5462(DLC)
                                         :
                Plaintiffs,              :       OPINION & ORDER
                                         :
        -v-                              :
                                         :
TESSERON LTD., INDUSTRIAL PRINT          :
TECHNOLOGIES L.L.C., and FORREST P.      :
GAUTHIER,                                :
                Defendants.              :
                                         :
---------------------------------------- X
```

APPEARANCES

For plaintiffs Canon Inc. and Canon U.S.A., Inc.:

Joseph A. Calvaruso
Lisa T. Simpson
Richard F. Martinelli
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

For defendants Tesseron Ltd., Industrial Print Technologies L.L.C., and Forrest P. Gauthier:

Steven C. Schroer
FITCH EVEN TABIN & FLANNERY LLP
1942 Broadway, Suite 213
Boulder, CO 80302

Jared E. Hedman
FITCH EVEN TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 1600
Chicago, IL 60603

Cary Kappel
DAVIDSON, DAVIDSON & KAPPEL, LLC
485 Seventh Avenue
New York, NY 10018

DENISE COTE, District Judge:

The defendants in this action terminated a patent license agreement after its licensee's affiliates challenged the validity of the patents in court proceedings in Florida. Finding the termination wrongful under the principles established by Lear, Inc. v. Adkins, 395 U.S. 653 (1969), this Opinion grants plaintiffs' motion for summary judgment for their breach of contract claim.

Plaintiffs Canon Inc. ("CINC") and Canon U.S.A., Inc. ("CUSA," collectively "plaintiffs") are suing defendants Tesserson Ltd. ("Tesseron"), Industrial Print Technologies L.L.C. ("IPT"), and Forrest P. Gauthier ("Gauthier," collectively "defendants") regarding a license agreement for the use of certain patented technologies (the "Agreement"). Plaintiffs and defendants have cross-moved for summary judgment on the plaintiffs' breach of contract claim. For the following reasons, plaintiffs' motion for summary judgment is granted and defendants' motion is denied.

BACKGROUND

The following facts are undisputed.[1] Defendant Gauthier

---

[1] Defendants failed to comply fully with Local Rule 56.1. Many of defendants' statements are allegations unsupported by citations to record evidence. Accordingly, the statements that do not comply with the Rule do not raise questions of fact. See Media Tenor Int'l AG v. Medco Health Solutions, Inc., No.

holds the patents to certain printer systems and technologies. Gauthier is founder and sole owner of Tesseron, which at the time relevant to the dispute was the assignee of all right, title, and interest in his patents. Tesseron first approached CINC to discuss a licensing arrangement for patents in 2002. The parties negotiated licensing terms throughout 2005, and they executed the Agreement at issue here, effective December 31, 2005. The two named parties to the Agreement are Tesseron and CINC.

To obtain the license, CINC made a single payment. Section 2.01 of the Agreement grants to CINC "a fully paid-up, non-exclusive license under the Licensed Patents to make, have made, use, exhibit, sell, offer for sale, import, lease and/or otherwise dispose of the Licensed Products." This grant is "[s]ubject to receipt of the payment" specified in Section 4.01, which is a "one-time, fully paid-up, non-refundable payment," as well as subject to "the terms and conditions set forth" in the Agreement.

The Agreement extends the CINC license to its affiliates who are not major competitors of the licensor. Section 2.02 grants CINC the right, "subject to compliance with the terms and conditions" of the Agreement, "to grant to any . . . Affiliates

---

13cv7223 (DLC), 2014 WL 2933215, at *1 (S.D.N.Y. June 27, 2014).

sublicenses under the licenses granted to it under this Agreement but without any right to sublicense further." "Affiliate" is defined in Section 1.01 as "any corporation, company, partnership or other entity (a) which is controlled by or is in common control with Canon directly or indirectly through one or more intermediaries as of the Effective Date" or "(b) which will be controlled by or under common control with Canon directly or indirectly through one or more intermediaries subsequent to the Effective Date and which as of the Effective Date is <u>not a major competitor with respect to the [licensed patents]</u>."  (Emphasis added.)  Section 2.02 further states that "Canon shall have no right to grant sublicenses to any person other than the Affiliates under this Agreement."

The Agreement also includes a provision permitting Tesseron to terminate the Agreement if CINC or its affiliates challenge or take steps to challenge the patents licensed under the Agreement.  It is this provision that is at the core of the parties' cross-motions.  Section 7.03 provides in pertinent part that

> <u>Tesseron shall have the right to immediately terminate this Agreement</u> by written notice to Canon . . . <u>[if] Canon or any of the Affiliates</u> for itself or through any third party <u>contests the validity of any of the Licensed Patents</u> or assists any third party in contesting the validity of the Licensed Patents.  The Parties acknowledge that this Subsection shall apply to the Licensed Patents to the extent that such

validity contest is permissible under applicable law. (Emphasis added.)  The Agreement is governed by the laws of the State of New York.

In March 2010, CINC acquired Océ NV, a Dutch corporation, as well as its subsidiaries Océ NV and Océ NA.  Océ and its subsidiaries are "major competitors" with Tesseron with respect to the licensed patents.  They could not, in other words, be "Affiliates" and receive sublicenses under the Agreement.  On June 10, 2010, Tesseron sued Océ NV and Océ NA in the United States District Court for the Middle District of Florida, alleging patent infringement.  Océ NV and Océ NA asserted, as a defense, that the subject patents are invalid.

On December 22, 2012, Océ NV and Océ NA initiated patent reexamination proceedings with the Patent and Trademark Office.  In January 2013, Océ NA was merged with a CUSA subsidiary to form CSA.

In January 2014, IPT, the current owner of right and title in the licensed patents, sued both CUSA and CSA in the United States District Court for the Eastern District of Texas.  IPT alleged that CUSA and CSA infringed those patents by the continued sale of allegedly infringing Océ printers.  CUSA and CSA raised their rights and privileges under the Agreement as an affirmative defense.  On January 27, 2015, the Texas action was

transferred to this Court as related to the instant case. <u>Industrial Print Technologies, L.L.C. v. Canon U.S.A., Inc. and Canon Solutions America, Inc.</u>, No. 15cv672 (DLC).

On or about April 28, 2014, Tesseron faxed notice to CINC that it was terminating the Agreement. Citing Section 7.03(c) of the Agreement, Tesseron explained that "[t]hrough its ownership and control of the Océ entities, [CINC] has itself directly and/or through the Océ entities challenged the validity of Licensed Patents" and has "provided ongoing assistance to the Océ entities . . . in support of these attacks on the validity of the Licensed Patents."

Plaintiffs filed the instant suit in this Court on July 21, 2014. Their complaint asserts six claims: breach of contract for improper termination; breach of contract for improper assignment; a declaratory judgment that CUSA holds a valid sublicense under the Agreement; a declaratory judgment that IPT's patent rights are exhausted with respect to CSA; tortious interference with contract; and breach of the Agreement's forum selection clause.

On January 26, 2015, plaintiffs filed two motions for partial summary judgment. One motion concerns their breach of contract claim for improper termination, and it is addressed in this Opinion. The second concerns the plaintiffs' two claims

for declaratory judgment. Defendants cross-moved for summary judgment on all three claims, and the motions were fully submitted on March 16, 2015. Fact discovery closed on April 30, 2015; the parties, however, have been permitted to supplement the record with respect to the declaratory judgment claims.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Eastman Kodak Co. v. Image Technical Servs.,Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008). "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight

Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted). If parties have cross-moved on the same claim, courts "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Children First Found., Inc. v. Fiala, --- F.3d ---, 2015 WL 2444501, at *4 (2d Cir. May 22, 2015).

Once the moving party has asserted facts sufficient to show that the non-movant's claims or affirmative defenses cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as are "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Plaintiffs argue that Section 7.03(c) of the Agreement is unenforceable as a matter of law because it grants Tesseron the right to terminate the Agreement in the event plaintiffs challenge the validity of the subject patents. Defendants, in turn, seek to confirm that the Section is enforceable. Because the Agreement was terminated pursuant to this provision, the propriety of Tesseron's termination of plaintiffs' rights depends upon the validity of the provision.

Analyses of contracts purporting to restrain or bar licensees from challenging patents begin with Lear, 395 U.S. 653. In Lear, the Supreme Court held that the doctrine of licensee estoppel[2] is unenforceable in the context of challenges to the validity of patents:

> [T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.  Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery.  If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification.  We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the

---

[2] The contract doctrine of licensee estoppel provides that "when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes." Idaho Potato Comm'n v. M & M Produce Farm & Sales, 335 F.3d 130, 135 (2d Cir. 2003).

negotiation of a license after a patent has issued. Id. at 670-71. Lear's core principles endure; the Supreme Court recently invoked it to support the proposition that restrictions of challenges to patent validity, "whether or not authorized by express contract, would impermissibly undermine the patent laws." Kimble v. Marvel Entm't, LLC, No. 13-720, 2015 WL 2473380, at *4 (U.S. June 22, 2015) (citation omitted).

As the Court of Appeals for the Second Circuit has explained, Lear requires courts to "weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest." Idaho Potato, 335 F.3d at 137. Accordingly, "covenants barring future challenges to a patent's validity entered into prior to litigation are unenforceable, regardless of whether the agreements containing such covenants are styled as settlement agreements or simply as license agreements." Rates Tech. Inc. v. Speakeasy, Inc., 685 F.3d 163, 172 (2d Cir. 2012).

The principles enunciated in Lear render Section 7.03(c) unenforceable. Whether framed as a licensor's right to terminate a license or the licensee's penalty for challenging the patent, Section 7.03(c) operates to discourage licensees from doing anything that threatens the patentholder's monopoly.

Confronted with the "hard choice" presented by contract provisions like the one at issue here, "many licensees will choose the less perilous course, and the patents under which they are licensed will remain uncontested."  Warner-Jenkinson Co. v. Allied Chem. Corp., 567 F.2d 184, 187-88 (2d Cir. 1977). While there is a "seeming inequity of allowing a licensee to keep his license while he attacks the validity of the licensor's patent," any such inequity "is outweighed by the public interest in placing no impediment in the way of those in the best position to contest the validity of the underlying patent."  Id. at 188.

    The defendants offer three arguments to avoid the clear import of Lear and its progeny.  First, they emphasize that Section 7.03(c) reserves the right to terminate to Tesseron, and does not work automatically.  Second, they contend that Lear only renders provisions like Section 7.03(c) unenforceable when they remove all incentive to challenge a license.  Third, they refer to several non-controlling decisions to argue that there is precedent for rejection of the plaintiffs' motion.  None of these arguments succeeds.[3]

---

[3] The defendants also suggest that CINC's breach of confidentiality provisions in the Agreement justified Tesseron's decision to terminate the Agreement.  This justification for the termination is not properly supported by admissible evidence, was not cited in the notice of termination communication, is not part of the defendants' pleadings, and was abandoned by the

Tesseron's reservation of discretionary authority to terminate the Agreement in the event its patents are challenged does not allow it to escape the requirements of Lear. Discretionary authority to terminate is no less authority to terminate than an automatic termination provision. "Lear's strong policy favoring the full and free use of ideas in the public domain" may not "be evaded through the simple expedient of clever draftsmanship." Rates Tech., 685 F.3d at 171 (citation omitted).

Acknowledging that the Agreement's terms reduce the plaintiffs' incentives to challenge their patents, the defendants contend that because the plaintiffs still have some incentive to challenge the defendants' patents, Lear does not apply. According to the defendants, Lear only governs those licenses where all incentive to challenge a patent has been removed. Defendants further explain that CINC's acquisition of Océ, a major competitor of the defendants with respect to the licensed patents, provides CINC with an economic incentive to escape from the Agreement.

Even assuming that the Agreement left CINC with some incentive to challenge the patents,[4] Lear still renders Section

---

defendants in their final memorandum on these cross-motions. Accordingly, it will not be further addressed.

[4] Defendants do not persuasively explain why the Agreement left

7.03(c) unenforceable.  The logic of Lear does not require explicit bans, automatic-breach provisions, or the complete removal of any and all incentives to challenge a patent.  Nor does it require case-by-case fact-finding to determine the extent to which a license or contract has left a party with an incentive to challenge a patent monopoly.  Provisions like the one at issue here operate to muzzle parties and discourage them from challenging patents.  The public interest in identifying invalid patents requires that such provisions be nullified.

    Finally, the out-of-circuit district court cases the defendants cite in support of their position are inapposite.  They chiefly concern the doctrine of patent misuse and their observations on the issues at stake here are cursory.  They do not provide a basis to alter the result reached in this Opinion.

---

CINC with any incentive to challenge the patents and risk losing the license.  After all, CINC's single non-refundable payment was the only payment required by the Agreement and it had already made that payment.

CONCLUSION

Plaintiffs' January 26, 2015 motion for summary judgment on the breach of contract claim premised on Section 7.03(c) is granted.  Defendants' February 20 cross-motion is accordingly denied.

Dated:    New York, New York
          June 24, 2015

                              _____
                                      DENISE COTE
                              United States District Judge